Wesley TRAHAN, Petitioner-Appellee,

v.

W. J. ESTELLE, Director, Texas Dept. of Corrections, Respondent-Appellant.

No. 75–2805.

United States Court of Appeals, Fifth Circuit.

Jan. 10, 1977.

Herman I. Little, Jr., Asst. Atty. Gen., John Pierce Griffin, Asst. U. S. Atty., Austin, Tex., for respondent-appellant.

Richard R. Morrison, III, Liberty, Tex., for petitioner-appellee.

Before GEWIN, COLEMAN and GOLDBERG, Circuit Judges.

COLEMAN, Circuit Judge.

Wesley Trahan was born in Houston, Texas, August 13, 1952. Evidence in the possession of Texas authorities indicated that on December 28, 1968, Trahan committed five felonies.[1] One of these was a particularly loathsome rape, in which Trahan and three male companions repeatedly raped Mary Jo Fregia until the seat of the vehicle they had forcibly entered was covered with blood and the victim's blood ran down into her socks. The record reveals that prior to the disposition of Trahan's case two of the participants, Lawrence Arceneaux and Carlo Melanson, pleaded guilty to their part in the crime and were sentenced to the penitentiary for life.

Trahan was arrested on December 31, warned of his rights, interrogated that night by the district attorney, and declined to give a statement. The county grand jury indicted him for rape on January 13, 1969. The indictments for the other alleged offenses were filed April 1.

In the meantime, Trahan's father had employed a Houston attorney, C. C. Divine, to represent the defendant, paying a retainer of $250. Divine forwarded a copy of Trahan's birth certificate to the district attorney, verifying his age, which rendered him immune to the death penalty under Texas law as then written. On April 2, 1969, Divine appeared in the Texas district court and obtained a continuance of the case. He thereafter disappeared into total silence, never seeing his client or maintaining touch with the court to find out what was going on with reference to the case. When the son later pleaded guilty, as well as in the state habeas corpus proceedings, the father testified that he was unable to raise the fee assessed by Divine, that he had talked with two other lawyers, that he could not pay the fee they proposed, and he had not thereafter seen or heard from Divine.

After pleading guilty to rape with the advice of appointed counsel (Attorney Carter), on August 29, 1969, and being sentenced to the state penitentiary for life, Trahan sought release by way of habeas corpus. On June 15, 1973, the Texas district court held a full scale evidentiary hearing. The testimony of the district attorney, of appointed counsel, of Trahan's father, and of Trahan himself, filled a typewritten transcript of 174 pages.

On the evidence thus adduced, the state court found that:

(1) Trahan "voluntarily, knowingly, and understandingly entered a plea of guilty with the assistance of effective counsel";

(2) "He has wholly failed to establish any fact indicating otherwise";

(3) His "plea of guilty was not induced nor made as a result of any fear of the death penalty"; and

---

1. Besides the rape of Mary Jo Fregia, the alleged offenses were (1) the armed robbery of the same individual, (2) the armed robbery of Dalbert Locke, (3) the felonious breaking and entering of a motor vehicle, and (4) the felony theft of a rifle and a shotgun.

(4) Trahan "is unworthy of belief".

Habeas corpus relief was denied. The Court of Criminal Appeals affirmed, without written opinion.

On December 3, 1973, Trahan filed his petition in the federal district court, alleging that his guilty plea was "involuntary" and "without assistance of effective court appointed counsel".

By agreement of the parties, the case was submitted on the state court record, oral argument, and post hearing deposition from Attorney Divine, in which he averred that he would not have abandoned his client for failure to pay the fee (but which overlooked any explanation for his retreat into inaction and ineffectiveness).

The District Court granted the writ. It did so, however, on the basis that the district attorney had negotiated a plea with the defendant in the absence of his attorney of record (Divine) thus denying Trahan counsel at a critical stage of the proceedings. The District Court further held that "It is unnecessary to determine whether attorney Carter's performance constituted ineffective assistance of counsel or whether petitioner's guilty plea was involuntary".

Since the District Court expressly failed to decide these issues, this Court should not now attempt to do so in the exercise of its appellate function.[2]

We now revert to a more detailed discussion of Trahan's contacts with the state district attorney. On the night of the arrest, the district attorney questioned Trahan and later admitted that he "could have" told Trahan that he was subject to the death penalty, although he asserted that he had no recollection of having done so. On January 31, 1969, the district attorney filed a notice of intent to seek the death penalty against Trahan. The birth certificate later forwarded by Divine demonstrated that Trahan was sixteen years of age at the time of the alleged offense and consequently could not have been assessed the death penalty under Texas law. Trahan remained in jail throughout.

On August 26 or 27, 1969, the September term of criminal court being imminent, the jailer informed the district attorney that Trahan had requested a meeting with the prosecutor, Mr. Woods. Woods testified that the request raised some concern because he knew that the defendant had an attorney of record. He nevertheless satisfied himself that a meeting without defense counsel present would be "ok". At the jailhouse conference which followed, Woods told Trahan that he would prosecute each and all charges against him until he succeeded in obtaining a life sentence. Woods did not inform Trahan that he could not receive the death penalty but testified that Trahan already knew that, arguing for a recommended sentence of less than life.

On August 29, Trahan, along with his parents, believed that Divine no longer represented him. Between 9:45 and 10 o'clock, the court appointed a lawyer of some sixteen years experience, including considerable criminal practice (Carter), to represent the defendant.

Quite naturally, Carter interviewed Woods to learn his attitude about the case. Woods advised Carter that the state was seeking the death penalty. Carter knew, however, that the death penalty was unavailable and so advised the defendant, which was information that the defendant already had. Woods offered to recommend life imprisonment on the rape charge, plus an agreement not to proceed on the other charges. He declared that he would never accept anything less. The district attorney opened his files to Carter's inspection. There Carter saw statements from Trahan's co-defendants, a picture of the vehicle in which the rape allegedly occurred, a picture of the blood on the seat, a shotgun allegedly used in the incident, and a watch belonging to the boyfriend who had been parked with the victim, which a girl had turned over to

2. *Lokos v. Capps*, 5 Cir. 1976, 528 F.2d 576; *Giles v. Alabama*, 5 Cir. 1967, 384 F.2d 383; *Alvis v. Kimbrough*, 5 Cir. 1971, 446 F.2d 548; *Colson v. Smith*, 5 Cir. 1970, 427 F.2d 143; and *Royal v. Dutton*, 5 Cir. 1968, 392 F.2d 544.

the police, *stating that she had received it from Trahan.*

Carter then conferred with Trahan in the jury room, advising him that the state appeared to have overwhelming evidence implicating him in the rape. Carter testified that Trahan was more interested in how much time he would actually have to serve on a life sentence. Carter told him that he did not know and offered the thought that this would somehow depend on Trahan's behaviour in prison (influencing good time credit, etc.).

Defendant and Carter then returned to the courtroom and announced that they were ready to proceed. The state announced its withdrawal of the notice of intent to seek the death penalty, this being a necessary prerequisite before the court could proceed to the receipt of a guilty plea.

In the proceedings which immediately followed in open court, all of Trahan's constitutional rights were explained to him. He signed a written waiver of trial by jury; he waived the appearance, confrontation and cross examination of witnesses and any documentary evidence; he waived the ten days allowed by law for preparation for trial by appointed counsel; he waived the time allowed by law before the imposition of sentence. He signed a request that he be sentenced at that time. He assured the court that he was not influenced by any threat, fear, persuasion, or delusive hope of pardon—that he was pleading guilty because he was guilty and for no other reason. He stated that he had not been promised a lighter sentence if he pleaded guilty. In response to a question propounded to him he responded that he, along with three other boys, "did rape Mary Jo Fregia", and that a fourth boy present did not participate in the rape. Being duly arraigned, he was sentenced to imprisonment for not less than five years nor more than life, with credit for the time spent in jail prior to the plea.

The other charges against him have never been brought to trial.

*Proceedings in the United States District Court*

The District Court, of course, was cognizant of the presumption of correctness which attends state court fact determinations under 28 U.S.C., Section 2254(d). He found the following "unusual and disturbing background" to Trahan's plea:

(1) Trahan decided to plead guilty during the conversation with the prosecutor in the absence of defense counsel;

(2) A "significant possibility" existed that fear of the death penalty had formed one of the bases for the plea;

(3) The trial court or appointed counsel would ordinarily have attempted to contact Divine, the attorney of record;

(4) With a minimum of counseling and an investigation confined to the district attorney's file, Carter allowed his client to plead guilty to the maximum applicable sentence within thirty minutes of his appointment;

(5) There should have been a dismissal of the other charges, rather than an agreement not to pursue them.

*The Law*

The law is such that we need not, indeed we should not, express any view concerning the merits of the preceding five points.

*Tollett v. Henderson*[3] was a case in which a state prisoner sought to invalidate his guilty plea for systematic exclusion of blacks from the indicting grand jury. The Supreme Court held:

We hold that after a criminal defendant pleads guilty, on the advice of counsel, he is not automatically entitled to federal collateral relief on proof that the indicting grand jury was unconstitutionally selected. The focus of federal habeas inquiry is the nature of the advice and the voluntariness of the plea, not the existence as such of an antecedent constitutional infirmity. . . .

We thus reaffirm the principle recognized in the *Brady* [*Brady v. U. S.*, 397

---

**3.** 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973).

U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)] trilogy: a guilty plea represents a break in the chain of events which has proceeded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in *McMann.*

In *McMann v. Richardson*[4] the Court had rejected a challenge to a state prisoner's guilty plea as motivated by a prior coerced confession, with the following observation:

> Whether a plea of guilty is unintelligent and therefore vulnerable when motivated by a confession erroneously thought admissible in evidence depends as an initial matter, not on whether a court would retrospectively consider counsel's advice to be right or wrong, but on whether that advice was within the range of competence demanded of attorneys in criminal cases.

Following *Tollett,* we have held that a collateral attack upon a guilty plea to rape was limited "to a challenge to the voluntary and knowing nature of his plea".[5]

■ We have also reaffirmed the principle that a guilty plea lacks the required voluntariness and understanding if entered on advice of counsel that fails to meet the minimum standards of effectiveness derived from the sixth and fourteenth amendments.[6]

■ It necessarily follows that since Trahan pleaded guilty with at least some advice from court appointed counsel, any question with reference to his uncounselled meeting with the district attorney, two or three days previously, was not open to attack by federal habeas corpus. The holding of the District Court to the contrary must be reversed.

Since, however, the District Court did not decide the issues of voluntariness and effectiveness of counsel, the case must be remanded for an appropriate disposition of those claims.

REVERSED and REMANDED.

GOLDBERG, Circuit Judge, concurring specially:

I concur in the result reached by the majority. I agree that the district court violated recent declarations of the Supreme Court when it granted the writ on the basis of deprivation of counsel at a critical stage prior to the plea, notwithstanding appointment of counsel the morning of the plea's entry. Accordingly, I also agree in the decision to vacate the judgment below and to remand for resolution of the questions open for consideration on collateral attack of this guilty plea—the effectiveness of counsel and the voluntariness of the plea.

Particularly in the factual context of this case and in light of the error below, however, I do not think that the decisions of the Supreme Court and this court on the scope of habeas challenges to convictions resting on guilty pleas admit of automatic application. I deem advisable fuller explanation of what was foreclosed below and what remains open. Moreover, I do not think that precedent may be read completely to exclude consideration of pre-plea events in the process of resolving the issues of the effectiveness of counsel and voluntariness. While I do not understand the majority to object to this latter observation, I do feel compelled for all the above reasons to add this special concurring opinion.

In doing so, I completely disavow any intent to *decide* the issues left undecided below. The issue erroneously reached there, however, bears both factual and legal relation to the issues this panel now re-

---

4. 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970).

5. *Lee v. Hopper,* 5 Cir. 1974, 499 F.2d 456, 462.

6. *Herring v. Estelle,* 5 Cir. 1974, 491 F.2d 125.

mands. Delimiting that relation requires consideration of the presumption of correctness attached in federal habeas proceedings to state fact findings. The task also calls for outlining the definitional contours of the effectiveness of counsel and voluntariness inquiries.

Clarification of these matters now can in my opinion facilitate the ultimate disposition of this case without invading the prerogatives of the trial court. Such clarification hopefully might serve, rather than obstruct, the goal of judicial efficiency.

I. Statement of Facts; Proceedings Below

In order that my understanding of the relationship between the applicable legal standards and this particular factual constellation emerge as clearly as possible from the confines of this opinion, I indulge in a separate statement of the facts at the risk of some repetition.

On December 31, 1968, Trahan, then sixteen years of age, and three older blacks were arrested in connection with the rape of a white girl in Liberty County, Texas.[1] District Attorney Woods discussed the rape charge with Trahan the night of his arrest, and "could have" told Trahan he was subject to the death penalty. Trahan was indicted for rape on January 13, and on January 31, 1969, the state filed a motion of intent to seek the death penalty against Trahan on the charge of rape. A grand jury later returned four other felony indictments against Trahan in the same court, all growing out of the incident involving the alleged rape: two counts of robbery by firearm, one count of theft, and one count of burglary of a motor vehicle.

Trahan's parents retained C. C. Divine to represent their son. On April 2 Divine made his only court appearance on Trahan's

behalf. The docket call that day resulted in a continuance. Divine subsequently sent a copy of Trahan's birth certificate to Woods to demonstrate that appellee had been only sixteen at the time of the alleged offense and consequently could not receive the death penalty under Texas law. Sometime around May, Divine informed Trahan's father that he could not proceed without more money; he remained out of contact with Trahan's case until after the August 29 guilty plea.[2]

On August 26 or 27, 1969, the jailer informed Woods that Trahan, continuously incarcerated from the time of his arrest, had requested a meeting with the prosecutor. Although the request concerned Woods, who knew appellee was represented by a lawyer, he somehow satisfied himself that a meeting without defense counsel present would be "ok". That jailhouse meeting between the two then took place; during its course the district attorney told Trahan he would prosecute each charge until he obtained a life sentence. Woods did not himself inform Trahan that he could not receive the death penalty. According to the prosecutor, however, Trahan already knew that sanction was unavailable and, desiring to plead and dispose of his case, attempted to use that knowledge in bargaining for a recommendation of less than life.

On August 29, the trial date, Trahan requested that the court appoint an attorney for him, assuming as did his parents that Divine no longer represented him. Between 9:45 and 10:00 a. m., the court appointed Wayne Carter who, prior to consulting with Trahan, discussed the case with Woods.

Woods advised Carter that the state was seeking capital punishment in Trahan's case

---

1. The state asserts on appeal that the district judge ran roughshod over the presumption of correctness to be accorded state findings of fact meeting certain requirements under 28 U.S.C. § 2254(d). I will comment on this claim more directly in Part III, *infra*. As a background to analysis of the case, I set out the facts as resolved by the state habeas judge or as undisputed in the record. Then follows explanation of the additional evidence received by the district judge and the view he took of the facts.

2. I reiterate that these are the facts as resolved by the state habeas judge; Divine's story, contained in his deposition to the district court, will be discussed, *infra*.

and that the prosecution's minimum recommendation would be life imprisonment plus an agreement not to proceed on the other charges. At this time Carter viewed the district attorney's file.[3]

Carter then conferred with Trahan in the jury room, where the attorney informed his client that the state possessed overwhelming evidence implicating him in the rape and would seek the death penalty.[4] Carter further advised Trahan that what the state sought made no difference, as it was his understanding that the state could not obtain the death penalty because of appellee's age. According to Carter, Trahan was aware of this fact and was more interested in how long he would serve under a life sentence. Carter confessed to Trahan that he knew nothing about that subject and offered only the vague assertion that length of incarceration would somehow depend on Trahan's behavior.

Trahan and Carter returned to the courtroom. They announced that they were prepared to proceed, a declaration that both sides understood to mean that a guilty plea was in the immediate offing. Moments later, at 10:15 a. m., the state announced its withdrawal of the motion of intent to seek the death penalty. The court then obtained from Trahan waivers of various rights in connection with the guilty plea. Carter explained each waiver, and Trahan stated to the court that he understood each. Trahan also stated to the court that he had raped the victim, as reflected in a signed stipulation.[5] Asked if he understood that the state had waived the death penalty, Trahan answered yes. The trial court accepted the plea and immediately announced a sentence of life imprisonment. The proceedings terminated between 11:00 a. m. and 12:45 p. m.[6]

In the federal habeas proceeding below, Trahan introduced the deposition of attorney C. C. Divine. The deposition contained Divine's recollection of the states of mind of Trahan and the prosecutor as of his conversations with them at the time of the April docket call.

In that first meeting with Trahan, Divine had noted the boy's concern with the death penalty. He had told Trahan not to worry, because his age required that he be tried in juvenile court. Divine maintained in his deposition that, during his contact with Trahan, he never discussed in more explicit terms the inapplicability of the death penalty. Asked if he thought Trahan had understood after this conversation that he could not receive the death penalty, Divine replied:

> I doubt that because it was obvious that he had been worked on by somebody. I don't know who. He wouldn't have been in such an agitated state of mind. He was very fearful about something and I don't think one little conversation from a lawyer telling him something contrary to what he has been led to believe would put his mind to rest.

(Divine Deposition at 28). Finally Divine related that despite his informing Woods of Trahan's age at the April hearing, the dis-

---

3. In that file, Carter saw statements from Trahan's co-defendants, a picture of the car in which the rape allegedly occurred, a shotgun allegedly used in the incident, and a watch belonging to the boyfriend who had been parked with the victim when the alleged rape occurred, which watch a girl had turned over to the police, stating she had received it from Trahan.

4. Carter so testified at the state habeas hearing. This testimony was consistent with Carter's letter of November 27, 1972, in response to a request from Trahan's counsel for a written summary of the evidence against Trahan and the sentence the prosecutor intended to seek absent a guilty plea. The letter stated:

> This was a cause in which there appeared to be overwhelming evidence against Trahan and the District Attorney, Mr. W. G. Woods, Jr. at no time threatened or induced him to make this plea of guilty. It was Mr. Woods' position that (sic) simply that he was going to try Mr. Trahan for rape, and was asking for the death penalty.

5. The stipulation speaks only in terms of statutory rape.

6. The four charges besides rape remain pending against Trahan. In accordance with the plea agreement, however, the prosecutor has not proceeded on any of those charges.

trict attorney had continued to appear outraged at the crime and to insist that he would seek the death penalty for all defendants.[7]

As the majority sets out, the district court, taking note of the presumption of correctness to be given state fact determinations under 28 U.S.C. § 2254(d), found the following "unusual and disturbing background" to Trahan's plea after reviewing the record of the state habeas proceeding and the Divine deposition: (1) Trahan decided to plead guilty during the conversation with the prosecutor at which defense counsel was not present; (2) a "significant possibility" existed that fear of the death penalty had formed one of the bases for Trahan's plea; (3) the trial court or Trahan's appointed attorney would ordinarily have attempted to contact Divine, still Trahan's attorney of record at the time of Carter's appointment; (4) with a minimum of counseling and an investigation confined to the district attorney's file, Carter allowed his client to plead guilty to the maximum applicable sentence within thirty minutes of his appointment.

Against this background the district judge concluded that the jailhouse negotiation of Trahan's guilty plea, at which the youth was unrepresented by counsel, had denied Trahan his constitutional right to counsel at a critical stage of the proceedings. The court thereupon granted the writ of habeas corpus without considering whether Carter's performance constituted ineffective assistance of counsel or whether the guilty plea entered August 29 had been otherwise involuntary. The state took this appeal.

II. Scope of Challenges to Guilty Pleas

The Supreme Court has in recent years radically restricted the grounds of federal habeas attack upon a guilty plea entered by a state prisoner with the advice of counsel.

In *Tollett v. Henderson,* 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973), a state prisoner sought to invalidate his guilty plea on the ground of systematic exclusion of blacks from the grand jury that had indicted him. As explained in the language quoted by the majority today, the Court concluded that the prisoner's claim could not in itself provide grounds for federal collateral relief. Following a guilty plea entered on the advice of counsel, a defendant "may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." Rather, "the focus of federal habeas inquiry is the nature of the advice and the voluntariness of the plea, not the existence as such of an antecedent constitutional infirmity. . . ." 93 S.Ct. 1608.

This court has had occasion to follow the *Tollett* rule. As the majority correctly states, we have recognized that a collateral attack upon a guilty plea can only challenge the voluntary and knowing nature of the plea. *See Lee v. Hopper,* 499 F.2d 456, 462 (5th Cir.), *cert. denied,* 419 U.S. 1053, 95 S.Ct. 633, 42 L.Ed.2d 650 (1974). Failure by defense counsel to meet the standards of effectiveness derived from the sixth and fourteenth amendments strips a guilty plea of that requisite voluntary and knowing nature. *See Herring v. Estelle,* 491 F.2d 125 (5th Cir. 1974).

Because Trahan pleaded guilty with at least some advice from court-appointed counsel August 29, I concur in the majority's conclusion that the question whether his uncounseled meeting with the district attorney two or three days prior to his plea amounted to an unconstitutional denial of counsel at a "critical stage" of the proceedings was not open to the federal habeas court under the guidelines set forth in *Tollett.* Having erroneously reached that question, the district court failed to consider whether ineffectiveness of counsel or

---

7. With respect to his representation of Trahan, Divine denied he had ever insisted on payment of a fee as a prerequisite to his continuing representation of Trahan and insisted that his representation had not terminated at the time of the guilty plea. However, he admitted he took no action on Trahan's behalf until he placed a call to the district attorney regarding Trahan's birth certificate sometime after August 29, whereupon he learned that Trahan had pleaded guilty.

prosecutorial coercion deprived the plea of voluntary and understanding character, questions which were properly before it. Despite some judicial erosion of the post-conviction relief available to those who plead guilty, these questions are within the residuum of constitutional rights which remains inviolate. Therefore, I also agree in the majority's decision to vacate the judgment below and remand the case for findings on those questions. I believe, however, that the factual nexus underlying both the issue erroneously reached and the two that properly should have been decided makes definition of the legal questions to be remanded less than automatic.[8] Consequently, I deem it a worthwhile exercise at this point to comment in some detail on the effect to be given the fact findings made in the state habeas proceedings and to the legal parameters to be observed in resolving the remaining issues.

III. Presumptive Correctness of State Fact Findings

In order to exhaust available state remedies, appellee first sought collateral relief in the Texas courts. The state judge accompanied his denial of that relief with findings of fact. Appellant here claims the district court erroneously disregarded those findings in granting the writ. The record does not unequivocally demonstrate that the trial court has abided the certitudes surrounding the state court's findings and conclusions; this court's obligation is to be certain that on remand these certitudes are respected and abided.

Consideration of the state's argument must begin with a solemn reminder from the Supreme Court in *Townsend v. Sain*, 372 U.S. 293, 311–12, 83 S.Ct. 745, 756, 9 L.Ed.2d 770, 785 (1963):

The whole history of the writ—its unique development—refutes a construction of the federal courts' habeas corpus powers that would assimilate their tasks to that of courts of appellate review. The function on habeas is different. It is to test by way of an original civil proceeding, independent of the normal channels of review of criminal judgments, the very gravest allegations.[9]

While the great writ has tremendous corrective power, it has never been viewed as limitless. Even in *Townsend*, the Court recognized state-federal comity and the conservation of judicial resources as relevant to the exercise of habeas jurisdiction. Congress attempted to implement these concerns in its 1966 amendment to the statute providing federal habeas corpus relief to state prisoners, 28 U.S.C. § 2254.[10] Under § 2254(d), then added to the statute, findings of fact made by a state court after a hearing are presumed correct in federal habeas proceedings, unless the district court finds present one of eight enumerated exceptions which relate to the fairness and adequacy of the state fact finding procedure.[11] An applicant for habeas corpus can

---

**8.** I do not understand the majority to contend that a federal habeas court must judge the voluntariness of a plea and the effectiveness of counsel's advice in an atmosphere completely sanitized of reference to events which preceded entry of the plea. The lesson of *Tollett,* and of the *Brady* trilogy whence it originated, *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); *Parker v. North Carolina,* 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970), is that violation of constitutional rights prior to a plea does not provide an *independent* basis for federal collateral relief. *See Tollett, supra,* 93 S.Ct. at 1608. The remainder of this opinion will in significant part address the relationship between pre-plea events and the issues of voluntariness and effective counsel.

**9.** The court in *Townsend,* faced with the recurring problem of the power of federal judges to try issues of fact anew in habeas corpus proceedings, outlined the situations in which a federal evidentiary hearing would be mandatory.

**10.** *See* Act of Nov. 2, 1966, § 2, 80 Stat. 1105.

**11.** The only exception of potential relevance here appears to be 28 U.S.C. § 2254(d)(8), making the presumption inapplicable to determinations of fact which the district court, on consideration of the record as a whole, concludes are not fairly supported. Discussion of the exception follows at note 12, *infra,* and accompanying text.

rebut the presumption by showing upon *convincing* evidence that a state court determination was erroneous. This possibility of rebuttal remains open in all cases. *See LaVallee v. Delle Rose,* 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973).

### A. Conclusory Findings: Mixed Questions of Law and Fact

The state habeas court "determined" that on August 29 Trahan pleaded guilty voluntarily and with the effective assistance of counsel. Because these conclusions relate to mixed questions of law and fact, however, they are not entitled to the section 2254(d) presumption of correctness.

*Townsend, supra,* decided prior to the amendments that added section 2254(d), qualified its consideration of the scope of the independent fact-finding power of federal habeas courts as follows:

> So-called mixed questions of fact and law, which require the application of a legal standard to the historical-fact determinations, are not facts in [the sense to which we refer].

*Townsend, supra,* 372 U.S. at 309, n. 6, 83 S.Ct. at 755, 9 L.Ed.2d at 783. The decisions of this court subsequent to the 1966 amendments have followed the language of *Townsend* and held that the resolution of such a mixed question does not constitute a determination of fact entitled to the § 2254(d) presumption. *Lee v. Hopper, supra,* speaks directly to the instant case:

> Since the issues of effective assistance and voluntariness present mixed questions of law and fact, and since such questions do not fall within section 2254(d)'s presumption of correctness, the district court was under no constraint to defer to the state conclusions.

499 F.2d at 462. This court has very recently reaffirmed its position that the effectiveness of counsel in connection with a state prisoner's guilty plea is a mixed question not subject to the § 2254(d) presumption. *See Mason v. Balcom,* 531 F.2d 717 (5th Cir. 1976); *see also Davis v. Heyd,* 479 F.2d 446 (5th Cir. 1973) (consistency between a witness' pre-trial statement and trial testimony is a mixed question); *Walker v. Caldwell,* 476 F.2d 213 (5th Cir. 1973) (effectiveness of counsel).

The federal district court is not to defer to state court resolution of such issues. Rather, "[t]he obligation of the federal judge is the opposite: to apply the proper federal constitutional standards based on the underlying facts, although the conclusions drawn from the facts may differ from the state court's conclusions." *West v. Louisiana,* 478 F.2d 1026, 1032 (5th Cir. 1973) *affirmed in relevant part,* 510 F.2d 363 (1975) (en banc). On remand, therefore, the district court is to review the state court record and the evidence introduced in federal court and independently resolve the issues of effective assistance of counsel and voluntariness.

### B. Specific Findings of Fact: The Death Penalty Question

The district court, however, may by no means disregard the Texas court's findings of fact. In contrast to the conclusion on a mixed question of fact and law, "specific historical facts found by a state habeas court (such as what an attorney actually did for his client), to which a standard of law is applied in deciding a mixed question of fact and law, do merit § 2254(d)'s presumption of correctness in a federal habeas proceeding." *Mason v. Balcom, supra,* 531 F.2d at 722. Trahan has levied no challenge to the fullness or fairness of the state hearing below.[12] Unless the district court finds particular determinations not fairly supported by the record, *see* § 2254(d)(8), the Texas court's specific fact findings are therefore entitled to the presumption of correctness, rebuttable by convincing evidence.

While it would be overreaching and no doubt wasteful to catalog the specific findings of the state court entitled to the section 2254(d) presumption, I do find it appropriate to comment on one critical factual issue: whether Trahan, at the time of his

---

12. Consequently he has raised no question as to the presence of one of the exceptions to the presumption of correctness listed in § 2254(d)(1–7).

guilty plea, knew he could not receive the death penalty because he had been under sixteen at the time of the alleged rape.

The Texas habeas court found that, by the time of the plea, Trahan did know he was not subject to the death penalty regardless of the state's motion of intent to seek it. That vigorously contested conclusion does seem supported in the state record.

First, the state habeas court resolved conflicts in the testimony against Trahan.[13] Federal habeas review may accordingly give no weight to Trahan's testimony in the state tribunal.

Second, the testimony of Woods and Carter, while equivocal and occasionally self-contradictory, does provide a basis for the state court's conclusion regarding knowledge. While Woods declined several direct invitations to say he had himself told Trahan the youth could not receive the death penalty, he did testify that, at his August meeting with Trahan outside the presence of defense counsel, the accused already knew that life was the maximum available punishment. Carter initially indicated that he had simply advised Trahan that the state possessed overwhelming evidence against him and that it was seeking the death penalty. He added during an increasingly intemperate cross-examination, however, that he had further advised Trahan that what the state was seeking made no difference and that he had informed Trahan of his understanding that because of the youth's age, he could not receive the death penalty.

To rebut the state court's conclusions, Trahan offered the federal district court only the deposition of attorney Divine. That deposition, based on Divine's April meeting with both Trahan and Woods, presented appellee as confused and scared regarding the death penalty, and took the position that Divine's one session of counseling with the youth had not removed either the fear or confusion. (Divine deposition at 28). Divine also claimed that Woods had demonstrated an intent to seek the death penalty, regardless of Trahan's age.

The district court, perhaps mindful of section 2254(d), relied at least in part on this deposition in commenting that there was a "significant possibility" that fear of the death penalty had formed one of the bases for the guilty plea. Given its resolution of Trahan's habeas petition, the court below never had to resolve this fact question more fully. It is unlikely, however, that the observations of Divine, whose last contact with Trahan or the prosecutor prior to the plea was in April, could constitute convincing evidence rebutting the state finding that Trahan knew the death penalty was inapplicable, a finding based on the testimony of Carter, the district attorney, and Trahan themselves.

While this court accords great sanctity to the findings of a district court, we must also be certain that the trial court not overstep the ground rules which describe the respect that all federal habeas courts must accord state court fact findings.[14] Under

13. The state court's findings of fact include a general resolution of conflicts in the testimony and evidence against Trahan and for the state. While the finding that Trahan was unworthy of belief is presumed correct under § 2254(d), note that in *Mason, supra,* where the state court had made a similar blanket credibility determination, this court found reason to disagree with that assessment but commented in the alternative: "In any case, the District Court was not required to strain to transform this credibility choice into a set of findings of fact binding upon it." 531 F.2d at 722, n. 9. In areas where the state court did not make specific findings, unlike Trahan's knowledge regarding the death penalty, the blanket resolution does not put an absolute end to the fact finding process on remand.

14. The standard by which we are to review the district court's rejection of the state fact findings is unclear. In *Shuler v. Wainwright,* 491 F.2d 1213 (5th Cir. 1974), we found the district court had improperly rejected state fact findings under § 2254(d) without indicating a standard of review; moreover, the parties put that case before the federal habeas court solely upon the state record. While a district court may find the section 2254(d) presumption rebutted without holding an evidentiary hearing, see *Heyd v. Brown,* 406 F.2d 346 (5th Cir.) *cert. denied,* 396 U.S. 818, 90 S.Ct. 53, 24 L.Ed.2d 69 (1969), at least in those situations where the district court overturns a state fact determination on the basis of evidence newly put before the district court, we would be inclined to treat the federal court's determination as a finding of

those ground rules, the Divine deposition at most suggests the possibility of overturning the state finding that the plea in no way resulted from any *fear* of the death penalty. It remains open to the district court to consider whether convincing evidence demonstrates that, although the youth would have answered at the time of the plea that he knew the death penalty could not be imposed, his state of mind was such that he simply could not act rationally upon that knowledge, but retained some fear of the spectre of execution.

Apart from this one lingering aspect of the role of the death penalty in Trahan's plea, the court on remand must examine other alleged sources of coercion and the claim of ineffective counsel. I would now briefly demark guidelines and areas of particular significance in the instant case pertaining to those legal issues.

## IV. Effectiveness of Counsel

This court has frequently concerned itself with the level of representation to which the sixth and fourteenth amendments entitle a state prisoner contemplating a plea of guilty. At some point the ineffectiveness of counsel invalidates a guilty plea; that is, "if the quality of counsel's service falls below a certain minimum level, the client's guilty plea cannot be knowing and voluntary because it will not represent an informed choice." *Herring v. Estelle*, 491 F.2d 125 (5th Cir. 1974); *see Mason, supra*, 531 F.2d at 725.

Admittedly it is not difficult to receive a passing grade as effective counsel, but the legal curve does have a sub-par category. In *Herring, supra*, the court synthesized and refined its formulations of effective assistance. It found the starting and high point in *MacKenna v. Ellis*, 280 F.2d 592, 599 (5th Cir. 1960), *cert. denied*, 368 U.S.

877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961): "counsel reasonably likely to render *and rendering* reasonably effective assistance." *Herring, supra*, 491 F.2d at 127 (emphasis in original). The *Herring* court went on to view this standard in the guilty plea setting:

Reasonably effective assistance is an easier standard to meet in the context of a guilty plea than in a trial, but counsel still must render competent service. It is the lawyer's duty to ascertain if the plea is entered voluntarily and knowingly. He must actually and substantially assist his client in deciding whether to plead guilty. It is his job to provide the accused an 'understanding of the law in relation to the facts.'

491 F.2d at 128. In *Colson v. Smith*, 438 F.2d 1075 (5th Cir. 1971), we had previously commented on one result of the Supreme Court's restriction of the grounds for collateral attack upon a guilty plea: "one cannot read the Supreme Court's opinions in *McMann, Parker* and *Brady, supra*, without being impressed by the significance the Court attached to the *role of counsel* in the process of deciding how to plead." *Id.* at 1079 (emphasis in original).

The trial judge must in the first instance apply these general standards to Carter's conduct as viewed through the state habeas record, the Divine deposition, and any additional evidence. On the outcome of that application I intimate no view. Counsel's accession in a plea of guilty after a conference of very short duration and a mere scanning of the prosecutor's file must, however, be viewed with some disdain and skepticism where the prosecution's recommendation in response to the plea is life imprisonment for a seventeen year old boy. Resolution of the effective counsel issue will nevertheless necessitate the consideration of a number of factors; [15] in remanding,

---

fact to be reversed only if clearly erroneous. *See* F.R.C.P. 52(a); *cf. Wright v. North Carolina*, 483 F.2d 405 (4th Cir. 1973) *cert. denied*, 415 U.S. 936, 94 S.Ct. 1452, 39 L.Ed.2d 494 (1974) (district court determination that state fact finding was supported in the record not "clearly erroneous").

15. Besides those developed at length in the text, *infra*, these factors will include the following: the amount of time spent by Carter, a factor that in itself cannot be dispositive, *see Walker v. Caldwell*, 476 F.2d 213 (5th Cir. 1973); *Lamb v. Beto*, 423 F.2d 86 (5th Cir.), *cert. denied*, 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970); *O'Neal v. Smith*, 431 F.2d

however, I would comment on two areas of performance particularly at issue—Carter's advice regarding the difference in penal consequences between pleas of guilty and not guilty and the effect of Trahan's uncounseled bargaining session with the district attorney.

## A. *Advice and Effort Regarding Sentencing*

In *Cooks v. United States*, 461 F.2d 530 (5th Cir. 1973), we vacated the conviction based upon a guilty plea entered after an attorney advised the defendant that a trial could result in six consecutive ten year sentences despite clear precedent that the acts alleged would support only one such sentence. On that advice, the defendant had pleaded expecting to receive what he thought was a significant bargain, when it was in fact the maximum punishment which could have been imposed. The court vacated the conviction on the theory that "significant misleading statements of counsel can rise to a level of denial of due process of law and result in a vitiation of the judicial proceeding because of ineffective assistance of counsel." 461 F.2d at 532. In accordance with the *Brady* trilogy, we recognized that "counsel need not be a fortune teller," but we did require that he be "a reasonably competent legal historian." *Id.* This court concluded that "[e]ffective counsel should have been aware of and advised the defendant of, at a minimum, the maximum—that is, the maximum penalty as the law was then understood." *Id.*

The Fourth Circuit followed *Cooks* in *Hammond v. United States*, 528 F.2d 15 (4th Cir. 1975). Counsel there had made a similar error regarding the possibility of separate convictions and consecutive sentences; as a result, he had allegedly advised a "relatively young" defendant that a trial might result in a 90–95 year sentence when in fact the maximum was 55. On this advice defendant entered a plea agreement under which he faced a maximum sentence of 25 years. Though the court recognized that not every item of misinformation would vitiate the voluntariness of a plea, it found that the discrepancy here amounted to ineffective assistance of counsel. The court borrowed from the definition of voluntariness formulated by Judge Tuttle in *Shelton v. United States*, 246 F.2d 571, 572, n. 2 (5th Cir. 1957) (en banc), *rev'd on confession of error on other grounds*, 356 U.S. 26, 78 S.Ct. 563, 2 L.Ed.2d 579 (1958), and adopted by the Supreme Court in *Brady v. United States*, 397 U.S. 742, 755, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), in concluding that "in order to plead voluntarily, a defendant must know the direct consequences of his plea, including 'the actual value of any commitments made to him.' " *Hammond, supra*, 528 F.2d at 19. The court found the erroneous advice had so exaggerated the benefit to be obtained from pleading guilty as to render the plea involuntary.[16]

Although the state findings do not pinpoint Carter's role, they do, with adequate support, indicate Trahan was informed of the availability of the death penalty. See part III. B, *supra*. Capital punishment, however, is not the subject of the only possible mistaken impression regarding sentencing for which Carter might be held responsible. Despite evidence, accepted by the state habeas court, that Trahan repeatedly sought information from the district attorney and Carter about the actual penal consequences of a life sentence, Car-

---

646 (5th Cir. 1970); the nature of the evidence against Trahan; Carter's confinement of his investigation to the district attorney's file and consultation with Trahan, omitting any independent contact with witnesses or co-defendants. *See generally Mason, supra*, 531 F.2d at 724–25. The list is not meant to be exhaustive.

**16.** *Hammond* makes clear that neither it nor *Cooks* rests on Fed.R.Crim.P. 11, which governs the acceptance of guilty pleas in federal court. The court specifically found that the plea proceedings had complied with Rule 11 and viewed the case rather as one where "there was ineffective assistance of counsel and a lack of voluntariness in the plea because it was not understandingly made", citing *Cooks*. *Hammond, supra*, 528 F.2d at 18. *Cooks* itself indicated it was applying constitutional standards. *See Cooks, supra*, 461 F.2d at 532. Thus the cases are apposite to the instant habeas petition involving a state prisoner.

ter confessed that he had advised Trahan of his total ignorance of those consequences and that he had made absolutely no effort to correct that lack of knowledge. In what was undoubtedly a good faith emphasis on his duty to ferret out the merits of the prosecution's case, he testified, "I wasn't concerned about the time he would get."

The consequences of this lack of information bear inquiry on remand. The state has maintained here and below, attempting to explain why anyone would enter a guilty plea in these circumstances absent the spectre of execution, that the agreement not to prosecute the other four charges against Trahan eliminated the possibility of consecutive sentences which would have carried adverse parole consequences. A few factors suggest that a minimal amount of effort by Carter could have revealed to him, however, that the district attorney's recommendation carried little or no "actual benefit". Such a revelation could easily have affected the plea of a client found to be so preoccupied with the amount of time he would serve.[17]

First, it is not clear that this plea avoided any adverse parole consequences. Regardless of the length of a sentence, Texas law makes a prisoner eligible for parole after serving twenty years or one third of his sentence, *whichever is less*. *See* Art. 42.12, Sec. 15, V.A.C.C.P.[18] This provision, in effect at the time of Trahan's plea, might have substantially undercut the prosecutor's bargaining power.[19]

Second, the record does not substantiate that the prosecutor had any intention of obtaining any adverse parole consequences had they been available. Rather, he was interested solely in obtaining one life sentence and was willing to prosecute Trahan, on more than the rape charge if necessary, until he obtained one. Regardless of Texas parole law, therefore, Carter should not have felt he was achieving anything other than the maximum possible punishment for his client.

Finally, the record does support a finding that Carter received adamant assurances from the prosecutor that his minimum recommendation would be a life sentence on the rape charge and an agreement not to prosecute the other charges. Such a finding indicates that further plea bargaining might have been to no avail. Carter, however, never confronted Woods with the assertion that stacking consecutive life sentences would have no adverse affect on Trahan. While the district attorney's focus on obtaining a single life sentence would suggest that this revelation might not have affected his recommendation, one cannot be certain what might have followed from the district attorney's learning that Trahan knew he had nothing to lose by not pleading guilty. Whether or not Carter could have moved the prosecutor, he did fail to explore any potential arguments to the court in favor of lenient treatment for his client. Trahan, sixteen at the time of the alleged offense, was the youngest of the co-defend-

17. This court would no doubt agree with the *Hammond* court that not every mistake regarding the discrepancy between possible punishments under pleas of guilty and not guilty can constitute ineffective assistance of counsel. Rather a court should weigh a mistake to see if there is a significant likelihood it caused a defendant to change a not guilty plea to guilty. This court has followed such a balancing approach in considering the analogous area of the disclosure required by Fed.R.Crim.P. 11 of the maximum punishment available under the actual charge to which a defendant pleads guilty. *See United States v. Woodall*, 438 F.2d 1317 (5th Cir. 1970) (en banc).

18. This court has recently upheld, against an eighth amendment challenge, a 1,500 year sentence for heroin sale because of this parole provision. *See Rodriguez v. Estelle*, 536 F.2d 1096 (5th Cir. 1976).

19. Placing the duty on counsel in some circumstances to have some familiarity with parole consequences is not contrary to *Herrera v. United States*, 507 F.2d 143 (5th Cir. 1975), or *Trujillo v. United States*, 377 F.2d 266 (5th Cir.), *cert. denied*, 389 U.S. 899, 88 S.Ct. 224, 19 L.Ed.2d 221 (1967). Those cases held that a judge need not disclose parole consequences under Rule 11 in connection with the charge to which the defendant pleads guilty; they did not confront the issue of how much understanding an attorney must supply a defendant of the relative degrees of punishment that might follow a plea of guilty to particular charges and a plea of not guilty that might trigger other charges.

ants. Whether or not an argument for relative leniency lay in these facts is unknown; what is known is that no one ever attempted to articulate one on Trahan's behalf.

I would by no means rule that the behavior described above constituted ineffective assistance of counsel. Rather, I simply suggest that these concerns are relevant to the issue. On Carter's own description, the case was one of overwhelming evidence against the defendant; Trahan was most interested in the penal consequences of alternative pleas. The First Circuit has observed in *Correale v. United States*, 479 F.2d 944, 949 (1st Cir. 1973):

> Particularly when a plea bargain is discussed, and hence sentencing becomes the client's preeminent concern, it is incumbent on counsel to acquaint himself or herself with all the available alternatives and their consequences for the defendant's liberty and rehabilitation.[20]

This circuit has found the failure to attempt any plea bargaining a relevant factor in the ineffective assistance calculus. *See Mason, supra,* 531 F.2d at 724; *Walker v. Caldwell, supra,* 476 F.2d at 222. Moreover, we have recently listed a defense attorney's failure to present character witnesses or exercise the right of allocution to beg for leniency among those derelictions rendering ineffective the lawyer's assistance to an eighteen year old with no prior record. *See Mason, supra,* 531 F.2d at 724. I need not predict how far this court would follow the principle stated by the First Circuit in *Correale.* Consistent with the cases in this Circuit, however, I would find some minimal acquaintance with the actual penal consequences of the range of sentences to which a not guilty plea, as well as a guilty plea, may subject a client and some small exploration of the possible returns of plea bargaining or arguing for leniency to be integral and salutary parts of the provision of effective counsel. The penological doubts ascribed to counsel here which the accused

consequently must have entertained, raise a question that must be addressed anew by the trial court consonant with the legal standard which we have attempted to explicate. To ask less would be to turn a blind, if not hypocritical, eye on the real situations and desires of many criminal defendants.

### B. *Actual Advice as to an Appropriate Plea*

One other factor is noteworthy in assessing the effectiveness of counsel in the special circumstances of this case. This court has recently emphasized that the effective counsel standard requires not only that whatever efforts an attorney makes on behalf of a client be of a certain quality but also that the attorney "actually and substantially assist his client in deciding whether to plead guilty." *See Walker v. Caldwell, supra,* 476 F.2d at 224. Specifically, in *Walker,* the court listed among several factors adding up to ineffective assistance an attorney's failure actually to advise an illiterate defendant whether or not to plead guilty. While the courts must certainly guard against the coercion of guilty pleas by counsel too concerned with their own schedules, *see Hora v. Louisiana,* 495 F.2d 1248 (5th Cir. 1974), they must also be alert to circumstances that call for counsel to impart to his client more than an explanation of the factual case, the nature of the charges, and the benefits and burdens of pleading guilty. On remand, the trial court should consider this aspect of counsel's role in the unusual circumstances presented.

At the state habeas hearing, Carter explained that his practice was to advise clients of the factual strength of the state's case in light of applicable law and then to allow them to make their own decisions as to how to plead to the extent they were capable. While this practice is certainly to be commended in the general run of cases, the trial court on remand should consider its adequacy in the instant case in light of

---

**20.** The court implied in dicta that an attorney's failure to know that a 4 to 8 year sentence was illegal, because a federal statute provides that one-third of the maximum sentence shall be the greatest possible minimum sentence, could amount to ineffective assistance.

the defendant's age and, more importantly, his uncounseled session with the district attorney only two to three days prior to the trial date on which Carter was appointed.[21] A defendant may well plead guilty knowing he will gain little or nothing in terms of his sentence simply because of the strength of the state's case. When that defendant is seventeen and has just emerged, ready to plead to those consequences, from a meeting with the prosecutor at which defense counsel was not present, however, it may be incumbent upon his attorney to go beyond a relatively passive characterization of the state's case to a more active ferreting out of the defendant's reasons for agreeing to plead guilty. Only then will he be able to rest assured the plea is based on the strength of the state's case and not on some misunderstanding or fear that arose out of an untutored bargaining session.

V. Voluntariness of the Plea: Other Attacks

Although ineffective counsel itself deprives a plea of the requisite understanding and volition, other sources may also render a guilty plea involuntary. The question of effective counsel cannot completely consume that of voluntariness, as one can easily imagine a situation in which some misconduct by police or prosecutors could coerce a defendant to plead guilty yet go undetected by an attorney who nevertheless met the relatively lax standard of effective assistance.[22]

The Supreme Court indicated as much in the *Brady* trilogy. In holding that an otherwise valid guilty plea could not be impeached in habeas proceedings by asser-

tions that it had been motivated by a prior coerced confession, unless counsel's failure to raise the question had constituted ineffective assistance, the court was careful to point out that theirs was not the situation "where the circumstances that coerced the confession have abiding impact and also taint the plea." *McMann, supra,* 397 U.S. at 767, 90 S.Ct. at 1447, 25 L.Ed.2d at 771. Similarly, in *Parker v. North Carolina, supra,* 397 U.S. at 796, 90 S.Ct. at 1462, 25 L.Ed.2d at 791, the court observed:

> . . . Even if the confession should have been found involuntary, we cannot believe that the alleged conduct of the police during the interrogation period was of such a nature or had such enduring effect as to make involuntary a plea of guilty entered over a month later. Parker soon had food and water, the lack of counsel was immediately remedied, and there was ample opportunity to consider the significance of the alleged promises.

No threats, misrepresentations, or promises had followed the alleged coercive interrogation, and the defendant had had the advice of family and counsel for a month before entry of his plea.[23] The court concluded that "[t]he connection, if any, between Parker's confession and his plea of guilty had 'become so attenuated as to dissipate the taint.'" *Id.* at 796, 90 S.Ct. at 1462, 25 L.Ed.2d at 791. Thus a plea must be scrutinized for involuntariness as well as ineffectiveness of counsel, though the latter of course will render a plea involuntary. Courts must not blind themselves to possible coercion out of an abundance of caution in criticizing practitioners of the admittedly imperfect science of law.[24]

---

**21.** The record is unclear as to whether Carter received information from any source as to this prior meeting. On the effect of that session on the voluntariness of Trahan's plea without regard to the effectiveness of counsel, see Part V, *infra.*

**22.** I speak hypothetically here; any conclusion as to conduct by state agents in this case must be drawn in the first instance by the district court, and I by no means suggest any particular one.

**23.** The defendant had alleged he had been promised unspecified help in return for agreement to plead guilty.

**24.** Were the comment in *Tollett* that a state prisoner "may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in *McMann,*" *Tollett, supra,* 411 U.S. at 267, 93 S.Ct. at 1608, 36 L.Ed.2d at 243, not styled a "reaffirmation" of the principles of the *Brady* trilogy, it might be a troublesome indication that the Court has completely merged the ques-

On remand, the district court should consider whether two or three days and the advice of Carter cured any coercion that it might find to have resulted from the district attorney's consultation with Trahan alone.[25] While the court's finding below that the plea constituted obvious "ratification" of an agreement reached with Woods at the meeting conducted outside the presence of counsel would not, without more, stand as a finding of involuntariness, the court should assess the voluntariness of the plea in light of Trahan's apparent ready agreement to accept the maximum punishment available by law or desired by the prosecutor regardless of Trahan's plea and the degree of advice offered by Carter, whether "effective" or not. That assessment should aim at a conclusion as to whether Trahan entered this plea simply on the strength of the state's case or due to some unabated misapprehension arising out of the uncounseled bargaining session.

That any misapprehension existed regarding the death penalty has been very largely foreclosed by the state findings discussed in part III.B. *supra.* On this source of alleged coercion, Trahan is limited to adducing support for the proposition, not

without difficulty, that he remained fearful of the death penalty despite having been informed that it was inapplicable in his case.[26] It also remains open to Trahan, however, to show that some prosecutorial overreaching, unrelated to the death penalty, occurred at the uncounseled bargaining session and tainted the subsequent plea. I of course express no opinion as to the ultimate resolution of any voluntariness dispute. I simply state that, as delineated above, the dispute remains a legitimate one in collateral attack upon this plea.

### CONCLUSION

In sum, the district court correctly chastised district attorney Woods for speaking with Trahan in the absence of defense counsel. It incorrectly concluded, however, that the dialogue, viewed *alone and apart* from the subsequent plea and the accompanying advice of counsel, justified the grant of the writ. Thus I join the decision to vacate and remand for a determination of the effectiveness of Trahan's counsel and the voluntariness of the plea, in light of the facts as found in the state habeas proceeding or as rebutted by appellee. Of course the uncounseled bargaining session may not

---

tion of voluntariness and effective assistance. The court, however, did indicate it was following the *Brady* line of cases, and it began its discussion of collateral attacks on guilty pleas with the observation that the "[f]ocus of federal habeas inquiry is the nature of the advice *and the voluntariness of the plea,* not the existence as such of an antecedent constitutional infirmity." *Tollett, supra,* 411 U.S. at 266, 93 S.Ct. at 1608, 36 L.Ed.2d at 243 (emphasis added). While the presence or absence of the constitutional claim there involved, the systematic exclusion of blacks from a grand jury, would certainly have an impact on a defendant's decision as to how to plead, it does not present the type of prosecutorial overreaching which would rob the defendant of his capacity to decide, as might the coercion of a confession or plea agreement on terms never unearthed by a defense attorney. *Tollett* did not face the court with the type of constitutional violation that might "have [an] abiding impact and also taint the plea," *McMann, supra,* 397 U.S. at 767, 90 S.Ct. at 1447, 25 L.Ed.2d at 771, and it should not be read as having placed a defendant's every egg in the rather small, if not porous, basket of effective counsel.

**25.** Though the district court incorrectly reached the question of whether the bargaining session in the absence of defense counsel violated Trahan's constitutional rights, it completely correctly rebuked the district attorney for participating in such a meeting. *See* ABA Project on Standards for Criminal Justice, The Prosecution Function § 4.1 (Tentative Draft 1970): "It is unprofessional conduct for a prosecutor to engage in plea discussions directly with an accused who is represented by counsel, except with counsel's approval." *See also,* ABA Code of Professional Responsibility DR 7–104 (A)(1).

**26.** Were the district court to find that Trahan retained a fear of the death penalty although he had been informed it could not be imposed, a conclusion of involuntariness would follow. This is not the oft-rejected claim that a guilty plea entered to avoid capital punishment is for that reason alone involuntary and nugatory. *See North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162, (1970). Here Trahan claims that a guilty plea resulted from apprehension that that ultimate punishment, not actually available under the circumstances, might otherwise follow.

be divorced from any effect it had on the adequacy of defense counsel's subsequent performance or the youth's subsequent volition. The confrontation between prosecutor and accused remains most relevant to both of the inquiries left to the court below.

I do not understand this remand to make the writ an impossible dream for Trahan: this court must, however, be certain that a conclusion to grant the writ rests on the limited grounds of attack that precedent allows. I concur in the result announced by the majority.