UNITED STATES of America ex rel. George H. HEALEY, Jr., Petitioner-Appellee,

v.

Joseph G. CANNON, Warden, Illinois State Penitentiary, Respondent-Appellant.

No. 76–1946.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 17, 1977.

Decided April 21, 1977.

Rehearing and Rehearing En Banc Denied June 15, 1977.

William J. Scott, Atty. Gen., Timothy B. Newitt, Asst. Atty. Gen., Chicago, Ill., for respondent-appellant.

Ralph E. Brown, Chicago, Ill., for petitioner-appellee.

Before FAIRCHILD, Chief Judge, and SPRECHER and WOOD, Circuit Judges.

SPRECHER, Circuit Judge.

The State of Illinois, respondent-appellant, appeals from an order granting petitioner-appellee a writ of habeas corpus. We consider in this appeal one of the two issues upon which the decision of the district court is based: whether petitioner was so misadvised by trial counsel regarding the consequences of his guilty plea that the plea must be invalidated because unintelligently given under the standards articulated in *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). We affirm.[1]

I

Petitioner was charged with the murder of his wife, and entered a plea of not guilty upon the advice of his appointed counsel. His jury trial commenced in the Circuit Court of DePage County in January 1970, during which petitioner took the stand and testified regarding the homicide.[2] Petitioner did not deny committing the acts which caused the death of his wife, but proceeded to trial upon the theory that, at worst, his conduct constituted voluntary manslaughter under Illinois law, because he lacked the requisite mental state to commit murder due to his intoxication,[3] or alternatively, that he was provoked at the time of the incident.[4] In support of these theories, pe-

1. Our affirmance on this ground makes it unnecessary to review the district court's decision that petitioner's Sixth Amendment right to a public trial was violated by the state trial court's action of conducting the proceedings surrounding the acceptance of petitioner's guilty plea in chambers. Also, petitioner raised numerous other assertions of error which occurred in the state court proceedings as grounds supporting his claim for habeas corpus relief in the district court. We have reviewed these remaining contentions and are satisfied that they were properly disposed of in the memorandum and order of the district court. Therefore, we restrict our discussion here to the question of the validity of petitioner's guilty plea.

2. The essential facts surrounding Mrs. Healey's death are not in dispute. Petitioner and his wife separated after 12 years of marriage, as a result of strife impelled by petitioner's heavy drinking and mounting gambling debts. Mrs. Healey sought legal advice regarding divorce. Petitioner became despondent to the point of contemplating suicide, and immersed himself in continual drinking.

On the morning of Mrs. Healey's death, petitioner drove to his wife's apartment and despite her efforts to block his entrance, forced his way in after he thought he observed a man exiting quickly through the rear door. Petitioner fired several shots, one striking Mrs. Healey in the abdomen, and then pursued her through the back exit of the apartment and into an apartment occupied by a neighbor. His gun jammed, and in full view of the neighbor, he beat Mrs. Healey's head and face with its butt until her skull was crushed.

3. Illinois law at that time permitted a defendant charged with murder to be convicted of the lesser included offense of voluntary manslaughter where the accused's state of voluntary intoxication was so extreme at the time of the homicide as to suspend entirely the power of reasoning. *People v. Strader,* 23 Ill.2d 13, 177 N.E.2d 126 (1961); *People v. Hicks,* 35 Ill.2d 390, 220 N.E.2d 461 (1966).

4. Ill.Rev.Stat. ch. 38, § 9–2 provides in pertinent part;

(a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:
(1) The individual killed, or
(2) Another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.

Apparently, petitioner's trial contention was that a series of provocative events incited the homicide: petitioner's wife had taken their children and left him, moving the furniture from their apartment; she refused to consider a reconciliation and consulted an attorney regarding divorce; she was accompanied by an-

titioner sought to introduce the testimony of a psychiatrist regarding petitioner's mental state, in the form of an answer to a hypothetical question based on events surrounding the homicide. Petitioner also proffered the testimony of two priests concerning his mental state and degree of intoxication immediately prior to the incident. Following an admissibility hearing in chambers, at which the judge, both counsel, the bailiff, the court reporter and petitioner were present, the trial court refused to permit the introduction of this evidence. Moreover, the court refused a tendered jury instruction on the elements of the lesser included offense of voluntary manslaughter.

Petitioner's counsel requested a brief recess in order to confer with both petitioner and his father. The attorney advised cessation of the trial proceeding by the entry of a plea of guilty to murder. In response to repeated inquiries concerning the possibility of raising error in the trial court's rulings on appeal following a guilty plea, both petitioner and his father testified that the attorney assured them that all questionable points were adequately preserved and were cognizable by an appellate court, and that petitioner's legal rights on appeal remained unchanged whether he pleaded guilty or was adjudged guilty by a jury.

Petitioner's counsel testified regarding his advice to petitioner during this conference that:

> The defendant inquired of me whether or not the possibility that the Judge ruled in error would be preserved for appeal,— that ruling would refer to both the hypothetical and the ruling on the instruction—and I indicated that if the Judge's ruling in fact was in error, notwithstanding a guilty plea, it was my personal opinion that a reviewing Court would review the issue, and the father and the defendant extracted assurances from me,

although of course all I could do was give them what was my opinion of the law.

Following this conference, the proceeding resumed in chambers and petitioner, accompanied by his father and his attorney, entered a plea of guilty to murder. The trial court thoroughly examined petitioner concerning his change of plea,[5] and subsequently sentenced him to serve a term of 40 to 75 years imprisonment.

The conviction and sentence remained undisturbed following an appeal which challenged only the excessiveness of the sentence imposed, *People v. Healey,* 132 Ill. App.2d 190, 267 N.E.2d 753 (1971), and leave to appeal that decision was denied by the Illinois Supreme Court.

Petitioner sought post conviction relief in the Circuit Court of DuPage County, alleging *inter alia* that his guilty plea was not intelligently given because made in reliance upon the erroneous advice of his appointed counsel. The court, after conducting an evidentiary hearing denied relief. The Illinois Appellate Court affirmed, holding in relation to petitioner's allegation of constitutional inadequacy of his trial counsel that:

> As to the allegation of improper advice at the time the change of plea was discussed, defendant asserts that he was assured by counsel that the psychiatric testimony and manslaughter instruction issues would not be waived by a plea of guilty. Our review of the record leads to the conclusion that even if this advice was erroneous it was harmless and did not result in substantial prejudice to defendant's rights since the proof of defendant's guilt was overwhelming. The validity of the plea is unaffected by this advice.

*People v. Healey,* 23 Ill.App.3d 214, 220, 318 N.E.2d 89, 94 (1974). Leave to appeal this decision was denied by the Illinois Supreme Court.

other man in her apartment on the morning of her death, and attempted to prevent petitioner's entry.

5. The trial court's questioning of petitioner is in compliance with standards set forth in *Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969) and Illinois Supreme Court Rule 402. Ill.Rev.Stat. ch. 110A, § 402.

His available state remedies thus exhausted, petitioner filed a pro se petition seeking habeas relief under 28 U.S.C. § 2254. Counsel was appointed to represent petitioner, and after determining that the necessity for holding another evidentiary hearing was obviated by the development of material facts in the state proceedings, *Townsend v. Sain,* 372 U.S. 293, 312–14, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), the district court granted relief, based on its findings that petitioner's guilty plea was rendered unintelligent, and therefore invalid, by the misstatements of counsel with respect to the effect of a guilty plea on appellate rights, and that petitioner's right to a public trial was infringed by the trial court in conducting in-chambers proceedings. Respondent has appealed.

## II

■■■ Because a plea of guilty absolutely waives the constitutional protections which insulate the accused and stands as a grave admission that the accused has transgressed the law, it accords with due process only if voluntarily and intelligently given. *Machibroda v. United States,* 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962); *Kercheval v. United States,* 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009 (1927). An intelligent plea is the culmination of a rational decision-making process, in which the accused assesses the numerous factors which bear upon his choice of whether to formally admit his guilt or to put the State to its proof. The plea must represent the informed, self-determined choice of the defendant among practicable alternatives. *Von Moltke v. Gillies,* 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948); *DeMeerleer v. Michigan,* 329 U.S. 663, 67 S.Ct. 596, 91 L.Ed. 584 (1947). The *Brady* trilogy [6] holds that a plea is deemed an intelligent determination of the defendant if it is given with the assistance of competent counsel. A defendant is not exempt from making the decision of whether to plead guilty merely because the choice is

a difficult one; but a guilty plea cannot be a conscious, informed choice if the accused relies upon counsel who performs ineffectively in advising him regarding the consequences of entering a guilty plea and of feasible options. *Hammond v. United States,* 528 F.2d 15 (4th Cir. 1975); *Colson v. Smith,* 438 F.2d 1075 (5th Cir. 1971).

Petitioner's contention that he was denied the effective assistance of counsel in his decision to enter a guilty plea, thereby invalidating the plea as unintelligently given, raises in the first instance questions of fact. What assistance and advice was actually afforded the accused in aid of his assessment of the feasible alternatives, and whether the accused in fact premised his decision to waive fundamental rights and enter a plea upon the valuation articulated by his attorney of the effects and ultimate consequences of the plea, and of alternatives to pleading, involve factual inquiries. Upon independent review of the record, we affirm the district court's factual findings.

First, any attempt to elevate to a matter of substance the inconsequential difference between the testimony of petitioner and his father and the testimony of the trial attorney regarding what advice was given Healey must fail. Petitioner maintains he was informed that none of his rights on appeal would be jeopardized by his entry of a guilty plea. Respondent asserts the advice was that if the trial court had actually committed error in its specific evidentiary rulings concerning the admissibility of psychiatric testimony and in its refusal to instruct the jury regarding voluntary manslaughter, a reviewing court would take cognizance of the error and reverse the conviction, notwithstanding the guilty plea. However, the timing of the plea belies the existence of any conflict. The plea was given toward the close of the trial, throughout which petitioner persisted in his plea of not guilty, and closely followed the particular rulings by the trial court which were the subject of counsel's assurances to petitioner

6. *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); *Parker v. North Carolina,* 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970).

regarding appellate review. Since these particular rulings were crucial to the progress of Healey's trial, and would have formed the basis for appellate review had he not entered a plea, we assume that these purported trial errors were the focus of petitioner's concerns pertaining to the preservation of error for appellate review. We therefore accept as factually accurate respondent's version of the advice given petitioner, since it does not significantly conflict with petitioner's version.

Second, the district court's finding that petitioner relied upon this advice regarding the consequences of entering a guilty plea in his decision to terminate the trial proceedings is incontrovertible. The record evidences keen concern on the part of both petitioner and his father that appellate review of trial errors would not be foreclosed by a guilty plea. The attorney assured them three times during the course of a brief conference that the trial court's determination on these crucial rulings was sufficiently preserved for appellate scrutiny. Under these circumstances, respondent's assertion that Healey's desire to avoid imposition of the death penalty formed the sole motivation for his change of plea is incredible. The State had requested the qualification of the jury for the death penalty at the outset, and had indicated throughout the trial that it would demand the death penalty were a verdict of guilty returned. If petitioner considered tendering a plea of guilty solely to escape execution, the propitious time for doing so would have been prior to trial, rather than near its conclusion. Petitioner's urgent concern for the preservation of trial errors for appellate review, and his decision to change his plea

only after extracting assurances from his lawyer regarding the appealability of the trial court's rulings minimize any fear of the death penalty as a motivating factor in his plea. The district court's finding that petitioner's reliance upon the advice of his attorney induced his plea is amply supported by the record.

■ This resolution of preliminary factual matters, however, merely initiates our inquiry, for the precise question of whether a particular accused has been deprived of the effective assistance of counsel is ultimately an issue of law. The Supreme Court has repeatedly emphasized that the effectiveness of legal representation afforded criminal defendants is to be appraised by normative legal standards which, when applied in a specific factual context, yield a resolution concerning whether a particular defendant received constitutionally adequate assistance of counsel. *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). In the guilty plea context, a lawyer need not give wholly accurate advice in order to render effective assistance; he need not correctly predict the admissibility of evidence or anticipate future judicial holdings. His advice, however, must be "within the range of competence demanded of attorneys in criminal cases."[7] *McMann, supra,* at 770–71, 90 S.Ct. at 1449.

■■ Trial counsel's advice to petitioner is grossly deficient when gauged by this standard. Illinois cases establish a clear precedent that a plea of guilty constitutes

---

**7.** The holding of the Illinois Appellate Court that any mistaken advice afforded Healey constituted harmless error due to overwhelming evidence of guilt is erroneous. As the district court properly noted, this standard is applicable only when a verdict of guilty has been rendered and is being reviewed. The reviewing court may examine the record to determine whether the evidence is sufficient to support the verdict, despite any claim of constitutional error. In reviewing a guilty plea, however, the record is not explored for evidence supporting the defendant's admission of guilt. Rather, the

only pertinent question is whether the voluntariness of the plea or its intelligent character has been infected by constitutional error. Moreover, the harmless error doctrine is patently inapplicable to the claimed deprivation of a due process right so fundamental as the effective assistance of counsel. *Glasser v. United States,* 315 U.S. 60, 76, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Gideon v. Wainwright,* 372 U.S. 335, 340–44, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Chapman v. California,* 386 U.S. 18, 43, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (Stewart, J., concurring).

an irrevocable waiver of any infirmity which was not jurisdictional or relevant to the voluntariness of the plea. *See, e.g., People v. Popescue,* 345 Ill. 142, 177 N.E. 739 (1931); *People v. Baxton,* 10 Ill.2d 295, 139 N.E.2d 754, *cert. denied,* 353 U.S. 976, 77 S.Ct. 1062, 1 L.Ed.2d 1138 (1957); *People v. Terry,* 12 Ill.2d 56, 145 N.E.2d 36 (1957), *cert. denied,* 356 U.S. 942, 78 S.Ct. 785, 2 L.Ed.2d 816 (1958); *People v. Deweese,* 27 Ill.2d 332, 189 N.E.2d 247 (1963); *People v. Dennis,* 34 Ill.2d 219, 215 N.E.2d 218 (1966). Thus, any irregularities occurring during a trial were not cognizable on appeal following a guilty plea under Illinois law. Counsel's statement that "if the Judge's ruling in fact was in error . . . a reviewing Court would review the issue," although somewhat circumspect, is a gross misinterpretation of this precedent. Clearly, in order to determine whether a trial court's ruling "in fact was in error," a reviewing court would be bound to take cognizance of a claim of error in the ruling and evaluate its merits. Yet, as Illinois law so clearly provides, this opportunity for appellate review of trial errors is precisely what a defendant waives by his plea of guilty. We consider this critical misstatement of prevailing state law to a defendant on trial in a state court a "serious dereliction on the part of counsel," *McMann, supra,* 397 U.S., at 774, 90 S.Ct. at 1450. Relying upon this misrepresentation of Illinois law, petitioner was deprived the occasion to "rationally weigh the advantages of [continuing his] trial against the advantages of pleading guilty," *Brady, supra,* 397 U.S., at 750, 90 S.Ct. at 1470 which due process requires. His plea is therefore invalid.[8]

Respondent adverts to the fluidity of federal law regarding the effects and consequences of a guilty plea prior to the Supreme Court's opinions in the *Brady* trilogy, decided some four months subsequent to

the termination of petitioner's trial. Because federal courts sometimes considered circumstances surrounding the entry of a plea in determining its validity, respondent argues that counsel's advice to the effect that a reviewing court might be cognizant of trial errors notwithstanding the plea is reasonable. This contention is meritless. The trial rulings involved here, pertaining to instructions and evidentiary matters, are not of constitutional magnitude and therefore are not cognizable by a federal court under 28 U.S.C. § 2254. Therefore, the position espoused by federal law on this question is immaterial. Moreover, the cases decided prior to the *Brady* trilogy indicate that federal courts investigated only constitutional infirmities in assessing the voluntariness and intelligence of a guilty plea. *See, e.g., Pennsylvania ex rel. Herman v. Claudy,* 350 U.S. 116, 76 S.Ct. 223, 100 L.Ed. 126 (1956) (uncounseled defendant); *Chambers v. Florida,* 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940) (coerced confessions which induced and tainted subsequent guilty pleas). *See also, Moreno v. Beto,* 415 F.2d 154 (5th Cir. 1969); *United States ex rel. McCloud v. Rundle,* 402 F.2d 853 (3d Cir. 1968); *Kott v. Green,* 387 F.2d 136 (6th Cir. 1967); *Reed v. Henderson,* 385 F.2d 995 (6th Cir. 1967); *Smiley v. Wilson,* 378 F.2d 144 (9th Cir. 1967), all of which involved a judicial investigation of coerced confessions which purportedly induced guilty pleas. Defects neither jurisdictional nor constitutional in nature, occurring at any prior stage in the proceedings, were deemed waived in federal courts by the entry of a guilty plea. *United States v. Rook,* 424 F.2d 403, 405 (7th Cir.), *cert. denied,* 398 U.S. 966, 90 S.Ct. 2180, 26 L.Ed.2d 550 (1970); *United States v. Doyle,* 348 F.2d 715 (2d Cir.), *cert. denied,* 382 U.S. 843, 86 S.Ct. 89, 15 L.Ed.2d 84 (1965); *United States ex*

---

**8.** The fact that counsel couched his remarks in terms of an "opinion of the law," as opposed to a guarantee that the opinion was accurate does not vitiate the constitutional deficiency of his advice to petitioner. The function of counsel is to counsel. It is precisely the superiority of training, knowledge and understanding of a lawyer that a client seeks in eliciting an attorney's opinion regarding a legal matter. The client cannot justifiably expect a guarantee of a particular outcome; he is, however, entitled to a legal opinion which is "within the range of competence demanded of attorneys . . ." *McMann, supra,* 397 U.S., at 771, 90 S.Ct. at 1449.

*rel. Staples v. Pate,* 332 F.2d 531 (7th Cir. 1964).

We note that the trial court properly and extensively admonished petitioner prior to the acceptance of his plea. While judicial admonitions in compliance with the requirements of *Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), aid the court in discharging its obligation to ascertain the voluntary and intelligent character of a plea, we agree with the position of the Fifth Circuit that:

> [A]n equally important aspect of the courts' responsibilities in this problem area is the protection of the accused's right to the benefit of reasonably competent counsel in making his plea, especially when that plea is entered on advice of counsel. . . . In [the *Brady* trilogy] it was obvious that the Supreme Court envisioned a system under which the defendant, advised by reasonably competent counsel, makes an informed and conscious choice. . . . When this system functions satisfactorily, it is both fair and reasonable to expect that a defendant who has made his choice and received whatever benefits flow therefrom be required to live by that choice. In any particular case in which the system fails, however, it is the courts' duty to supply relief.

*Colson, supra,* at 1079.

In invalidating petitioner's guilty plea, we express no opinion regarding the propriety of the trial court's critical rulings. Whether the judge ruled correctly and would have been upheld on appeal is immaterial. Petitioner concluded his trial by the entry of a plea of guilty with the understanding that appellate review of the court's determinations was not thereby obviated. Because he was misadvised by counsel regarding his feasible options, due process requires that the plea be vacated.

In affixing our imprimatur to the practice of invalidating guilty pleas on the basis of conversations between a defendant and his counsel, we share the concern of the district court that defendants will be encouraged to fabricate purported conversa-

tions in order to escape the consequences of a guilty plea. However, we agree that this concern is groundless in the unique factual context of this case. Petitioner, his father, and trial counsel essentially concur in their testimony pertaining to the content of the advice afforded petitioner. The record manifests substantial evidence in support of petitioner's claim that his plea was not intelligent because rendered upon advice of counsel which was constitutionally inadequate under the *McMann* standard. *United States ex rel. Curtis v. Zelker,* 466 F.2d 1092, 1098 (2d Cir. 1972), *cert. denied,* 410 U.S. 945, 93 S.Ct. 1405, 35 L.Ed.2d 612 (1973). *Cf. United States ex rel. Robinson v. Housewright,* 525 F.2d 988, 991–92 (7th Cir. 1975).

Because we hold petitioner's guilty plea invalid, we do not consider whether he was deprived of the right to a public trial because the trial court accepted his plea in chambers. Accordingly, the judgment of the district court is

Affirmed.

HARLINGTON WOOD, Jr., Circuit Judge, dissenting.

I must respectfully dissent from the majority, and here set forth my reasons for taking a contrary view.

The majority finds it necessary to consider only one of two issues on appeal, the guilty plea and not the second issue, petitioner's Sixth Amendment right to a public trial. Since I disagree on the first issue I would reach the second and likewise reverse, but for present purposes it is not necessary to explain my views upon that second issue.

I fully agree with the principles and supporting cases cited by the majority, and only disagree with their interpretation as applied to the particular facts of this case. I do not believe those cases compel the result reached.

The guilty plea, made after the government had completed its case in chief and the defendant had testified in his own behalf, must be viewed in the context of the

trial, the evidence and the surrounding circumstances shown in the record at the time the plea was made. I believe that perspective is necessary in order for us to try to determine whether or not the defense attorney's allegedly incorrect advice to petitioner was a sufficient motivating factor to invalidate the guilty plea as the majority holds.

To attempt this I believe the uncontroverted evidence of the murder should be lifted out of the footnote and expanded from the record. This is not for the purpose as in *People v. Healey*, 23 Ill.App.3d 214, 318 N.E.2d 89 (1974), of determining whether or not the allegedly mistaken advice was only harmless error due to the overwhelming evidence of guilt, but rather to try to better understand all the circumstances surrounding the change of plea in order to determine whether that advice may have motivated the change of plea, or whether some other consideration was controlling.

The state's case consisted of the testimony of police officers, investigators, laboratory technicians and other witnesses typical to a murder case. It was not, however, a circumstantial case. There was no question of the identity of the assailant or of the nature of the attack upon the deceased. The murder took place in the adjacent apartment of a neighbor, Mrs. Dussalt, who witnessed the whole tragedy.

Mrs. Dussalt testified that Mrs. Healey ran screaming from the nearby Healey apartment into Mrs. Dussalt's apartment with her husband, the petitioner, in close pursuit. Mrs. Dussalt endeavored to close the door, but the petitioner forced his way in firing a shot from an automatic pistol he was carrying. The bullet lodged in the kitchen wall between Mrs. Healey and Mrs. Dussalt. Mrs. Healey then ran into Mrs. Dussalt's living room with petitioner still in pursuit. He fired two more shots. Mrs. Healey fled back into the kitchen now holding her side. Mrs. Dussalt ran to protect her young son while Mrs. Healey's screaming continued. Then the screaming stopped and Mrs. Dussalt saw the petitioner standing over his wife stretched out on the kitch-

en floor. He told Mrs. Dussalt that it was all over and to call the police, but then he fled leaving the gun behind.

The police testified that the butt of that gun was covered with blood, hair and skin tissue. Several deep gouges were observed in Mrs. Healey's body, part of her ear had been torn off, and her skull was caved in. A pathologist, who performed a partial autopsy on Mrs. Healey, testified that Mrs. Healey had two fractured hands, two bullet holes in her chest, many cuts and bruises on her face and many deep fractures throughout her skull. The story unfolded that the gun had jammed after the first three shots, and petitioner had then used it as a club to beat his wife to death.

In his own defense the petitioner took the stand and testified about his marital problems, drinking habits and the events leading up to the murder. He related that he went to the apartment which had been shared by his wife and himself, the door was open, and his wife, who the evidence showed was fully clothed, was present. Petitioner thought he saw someone run out the other door to the apartment. I do not believe, however, that the record supports the majority's statement that "he thought he observed a man" leave the apartment. The petitioner was not sure whether the person may have been a man or a woman. He told how he pursued his wife into Mrs. Dussalt's apartment with his gun, but then his testimony becomes somewhat vague about the actual details of the murder. It does however outline the testimony of Mrs. Dussalt. One more defense witness, petitioner's uncle, was called to confirm that petitioner had called him from Nebraska where petitioner had fled after the murder. At this point in the case some matters were taken up in chambers outside the presence of the jury. Defense counsel advised the court that he had two priests to be called as witnesses, and also an expert to whom he intended to propound a hypothetical question about the petitioner's mental state. It appeared to be petitioner's purpose to try to establish that his act was manslaughter, not murder. The state objected to calling the

priests unless the testimony of the priests was to relate to "insanity, provocation or drunkenness" for purposes of manslaughter consideration. Defense counsel's response was that the testimony of the priests would go to "the jury's consideration as whether it is a proper case for the death penalty." The court sustained the objection after a prolonged discussion and an offer of proof on the basis that the testimony was immaterial to the manslaughter issue. The majority opinion states that the priests could have testified about petitioner's mental state and degree of intoxication immediately prior to the accident, but the record shows that one priest visited with petitioner only on Monday and the other only on Wednesday before the Thursday murder. Next the parties undertook to consider in chambers the proposed hypothetical question. After long recitations of the evidence as assumptions, the hypothetical question requested the doctor's opinion as to whether the hypothetical person in killing his wife was acting under a sudden and intense passion resulting from serious provocation by the individual killed. The state objected on the grounds that the question invaded the province of the jury by calling for an answer to the ultimate question, and further because there was no evidence of any provocation from petitioner's wife. The objection was sustained, the court holding that there was no evidence bearing out a manslaughter theory. Consequently there was to be no manslaughter instruction. It was at this point that defense counsel asked for a short opportunity to confer with his client, and after ten or fifteen minutes came back at which time the plea was changed to guilty. During that short conference outside the presence of the court the appeal opinion was given by defense counsel upon which the majority bases its holding.

It is at that point in the proceeding, against the background of overwhelming evidence adverse to petitioner and the collapse of the defense effort, that we must try to reconstruct from the record what the motivating factor was for petitioner's decision to change his plea. It is the majority view that the petitioner's "urgent concern for the preservation of trial errors for appellate review, and his decision to change his plea only after extracting assurances from his lawyer regarding the appealability of the trial court's rulings, minimizes any fear of the death penalty as a motivating factor in his plea." Quite to the contrary, I believe that record illustrates that the change was induced by the basic human desire of petitioner to save his own life. He did not have to plead guilty in order to have trial errors reviewed on appeal. The thread of that concern with the death penalty runs throughout.

The jury had been qualified for the death penalty. Any rational view of the evidence then pending before the jury would have to be that a vicious murder had been proven well beyond a reasonable doubt, if not all doubt. It was not the rulings of the trial judge that robbed petitioner of a manslaughter defense. Viewing the record, including the proffered testimony, there is no evidence which shows insanity, provocation, or drunkenness at the time of the murder, or any other excuse so as to sustain only a manslaughter charge. Even the psychiatrist chosen by the defense had concluded that petitioner suffered from no mental illness. Nothing in the record shows any provocation on the part of the deceased wife. If someone did run out the back door and if it was a man, in the circumstances shown to have existed then and there it could not be considered provocation. The petitioner was admittedly a heavy drinker, but there is insufficient evidence to show that excessive alcohol at the time was a factor in the murder. After petitioner arose on Thursday morning, he drove various places, then drove to their apartment, parked his car, had a conversation with the janitor who noticed no alcohol odor or anything unusual about the defendant, climbed the stairs to their apartment and began the fatal attack on his wife. It was obvious petitioner had no defense.

The influence on petitioner of the possible death penalty is illustrated by various things including petitioner's own allegation

that he was "threatened" by the trial judge and prosecutor with the death penalty. At the state post-conviction hearing the petitioner testified as to what had taken place in the short attorney-client conference. The first question from petitioner's counsel at that hearing was:

"What did your attorney say to you with regard to the possibility of entering a guilty plea at that point?

A. You mean the results of it?

Q. What did he say to you?

A. He said he thought we should plead guilty that because of the way things were working out there was no defense and that the jury—he claimed that it looked like I would get the death penalty."

And later:

Q. Did he explain to you what it meant to enter a plea of guilty?

A. It just meant—he first said it meant that I would probably get a lighter sentence than if I had persisted in going on with the trial."

On cross examination the petitioner responded to the question:

"You entered a plea, did you not. Mr. Healey, because you felt you would receive a lesser sentence than you would if you proceeded on with the conclusion of the trial? Is that correct?

A. Yes, that was the general feeling."

The advice from his attorney about appeal was mentioned by petitioner in his testimony, but I cannot view those comments as having anything but minimal significance compared with the death penalty potential.

Petitioner's father, who had also been present at the attorney-client conference, testified at the post-conviction hearing that defense counsel told them "that it was not proper to continue the trial, that it would not be in my son's favor and that in view of the fact that the manslaughter instruction was not allowed, it would be futile, it would only incense and anger the judge." The father testified that when asked by his son what to do he advised him to plead guilty

because the judge would be more lenient as the son had never been convicted of a crime before and because he had voluntarily surrendered. The father testified that he asked counsel "three times" about the appeal possibilities. In the testimony of defense counsel, however, I find no mention of even one question on that issue from the father, nor even any confirmation of the father's questions in the testimony of petitioner.

What defense counsel did say, as appears from his testimony in the post-conviction proceeding, was that "the decision was based on the fact that there is the everpresent [sic] possibility the jury would recommend the death penalty." Defense counsel confirmed he had given petitioner limited advice about an appeal, although the majority accepts the broader version testified to by petitioner and his father. The defense counsel explained to petitioner and his father that the court's rulings on the hypothetical question and the manslaughter instruction were preserved. However, the defense counsel testified that he did not advise that it was his opinion that the case would be reversed and remanded. I do not see that it is probable or reasonable to conclude that petitioner changed his plea as a result of such uncertain and limited appeal advice. Further, petitioner's mother testified at the post-conviction proceeding that just shortly before petitioner changed his plea that he told his mother that his attorney had "sold him out". If petitioner believed that, I find it unlikely that he would have put so much faith and confidence in that appeal advice so as to cause him to admit the crime.

The majority also reasons that if "petitioner considered entering a plea of guilty solely to escape execution the propitious time for doing so would have been prior to trial rather than [at its] conclusion." I cannot accept that as a general rule. It is not unusual for the defense to wait and test out the state's evidence in trial to see if some weakness can be developed in the state's case. What developed before the jury in this case, however, was a clear and

convincing case of murder, and the total collapse of a weak unsubstantiated manslaughter theory of defense. Petitioner waited until the last minute before he changed his plea to avoid the death penalty.

When petitioner changed his plea he was asked by the trial judge if he had something to say.

"Yes, Your Honor, Up to now I—I just wanted to tell the story, and face up to it."

I do not see that to be the comment of an accused confessing merely to get on with an appeal. At that same time the father asked the trial judge about who would make the determination of the sentence, but neither the father nor any one else made any inquiry of the court about appeal. Further, the petitioner then admitted to the court that he understood that unequivocally he was admitting that he had committed the offense of murder done without lawful justification and with intent to kill his wife, shoot her with a gun and beat her about the head thereby causing her death.

Appeal did follow, but only upon the issue of alleged excessiveness of the sentence. I find nothing in the record to show that any effort was made by petitioner to raise on that appeal any alleged trial errors or the issue of the alleged incorrect advice of counsel about appeal as inducing the guilty plea. It would seem that if appeal on those issues was what prompted the guilty plea something would be reflected in the appeal that immediately followed.

The *Brady* trilogy * cited by the majority is not antagonistic to my view of this case. *Brady* makes it clear that fear of death as a factor in a plea of guilty does not invalidate the plea, and says what we have been trying to say here:

The voluntariness of Brady's plea can be determined only by considering all of the relevant circumstances surrounding it. Cf. *Haynes v. Washington*, 373 U.S. 503, 513 [,83 S.Ct. 1336, 10 L.Ed.2d 513] (1963); *Leyra v. Denno*, 347 U.S. 556, 558

[,74 S.Ct. 716, 98 L.Ed. 948] (1954). One of these circumstances was the possibility of a heavier sentence following a guilty verdict after a trial. It may be that Brady, faced with a strong case against him and recognizing that his chances for acquittal were slight, preferred to plead guilty and thus limit the penalty to life imprisonment rather than to elect a jury trial which could result in a death penalty. (Footnote omitted.) *Brady*, supra, 397 U.S. at 749, 90 S.Ct. at 1469.

And further at page 751, 90 S.Ct. at page 1471:

The issue we deal with is inherent in the criminal law and its administration because guilty pleas are not constitutionally forbidden, because the criminal law characteristically extends to judge or jury a range of choice in setting the sentence in individual cases, and because both the State and the defendant often find it advantageous to preclude the possibility of the maximum penalty authorized by law. For a defendant who sees slight possibility of acquittal, the advantages of pleading guilty and limiting the probable penalty are obvious—his exposure is reduced, the correctional processes can begin immediately, and the practical burdens of a trial are eliminated. For the State there are also advantages * * It is this mutuality of advantage that perhaps explains the fact that at present well over three-fourths of the criminal convictions in this country rest on pleas of guilty, a great many of them no doubt motivated at least in part by the hope or assurance of a lesser penalty than might be imposed if there were a guilty verdict after a trial to judge or jury. (Footnote omitted.)

*McMann* notes that even though a guilty plea must be intelligently made it is not a requirement that all advice offered by the defendant's lawyer withstand retrospective examination in a post-conviction hearing. *McMann*, supra at 770, 90 S.Ct. 1441. As I

* *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); and *Parker v. North Carolina*, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970).

read that case the advice of counsel would have to be gross error which actually prompted the change of plea before the plea should be invalidated.

The majority also cites *Colson v. Smith*, 438 F.2d 1075 (5th Cir. 1971) in which the court held that there was no evidence that counsel's advice to plead was based on any evaluation of the petitioner's chances had he gone to trial. That is not our issue. That case in reliance on the *Brady* trilogy takes note, however, that "guilty pleas are meant to be and should be final. And if there was ever any doubt in our minds of the inviolability of that principle, there is certainly no longer any doubt after the Supreme Court's recent decision declaring with unmistakable clarity its firm commitment to the finality of guilty pleas." In my view we are drastically weakening that principle in the present case.

I find no justification for invalidating the guilty plea. I do not, as the trial court and the majority did, find that "petitioner's reliance upon the advice of his attorney induced his plea. . . .", and to say that he did it to avoid the death penalty is "incredible", nor do I find in the record that it is "incontrovertible" that petitioner relied on the appeal advice of counsel in terminating the trial proceedings. In a clear case of murder in which there was no defense, we now, in effect, permit petitioner to manufacture for himself an undeserved opportunity, seven years after the murder, to try the second time to avoid responsibility for the murder which he admitted in court. This case may prompt much sifting and reconstruction of attorney advice to suit their immediate purposes by others seeking a way out after a change of heart. I believe petitioner was properly put where he belongs and where the public deserves to have him kept until his sentence has been served. I would reverse.